Stacy **MITCHELL**, et al., Plaintiffs,

v.

**CARRIER CORPORATION**, Defendant.

No. 3:93–CV–26 (DF).

United States District Court,
M.D. Georgia,
Athens Division.

Oct. 16, 1995.

---

**4.** The Court notes that this case was decided   after the parties filed their briefs.

**1572**

Dawn F. Luzier, Athens, GA, Joseph Calhoun Nelson, III, Athens, GA, Sujata Gupta Winfield, Athens, GA, Kent Spriggs, Tallahassee, FL, Joel N. Shiver, Athens, GA, for Stacy Mitchell, Tony Foote, Kenneth Stephens, Curtis Smith.

Robert E. Rigrish, Peter F. Munger, Atlanta, GA, Willie Jake Lovett, Jr., Atlanta, GA, for Carrier Corporation.

## *ORDER*

FITZPATRICK, Chief Judge.

Defendant has moved for summary judgment against the named plaintiffs in the instant case. Since the filing of this motion, the complaints of Joe Brown and Dolly Wise have been dismissed by joint stipulation, pursuant to Rule 41 of the Federal Rules of Civil Procedure. Likewise, the parties agreed to a partial dismissal of Stacy Mitchell's complaint, eliminating his claims of discriminatory and retaliatory denial of promotion. Stacy Mitchell, Curtis Smith, Tony Foote, and Kenneth Stephens are the only remaining plaintiffs in this case.

Plaintiffs Mitchell and Smith are black production employees at Defendant's Athens, Georgia, facility, which manufactures refrigeration units for trailers that transport perishable products. In April 1992, Smith and Mitchell each filed complaints with the EEOC alleging that Carrier had engaged in race discrimination in some employment decision or practice at its Athens plant. Plaintiffs Foote and Stephens, black males, applied for positions in Carrier's Paint Department in 1992 to no avail. In June 1992, Stephens filed charges against Carrier with the EEOC, and in September 1992, Foote did the same.

On March 1, 1993, the EEOC issued right to sue letters for Plaintiffs' charges. Plaintiffs have alleged race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a), 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and the Thirteenth Amendment of the United States Constitution.

Summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of summary judgment, the district court resolves all reasonable doubts about the facts in favor of the non-moving party. *Warrior Tombigbee Transport Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). The party opposing the motion for summary judgment, however, cannot rest on his pleadings to present an issue of fact, but rather must make a response to the motion by filing affidavits, depositions, or otherwise that illustrate material facts in the case necessitating trial. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 658 (11th Cir.1984).

Summary judgment is appropriate if the non-moving party bears the onus of proving an element of his case and fails to produce evidence adequate to create a genuine question of fact regarding the existence of that element. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party may produce evidence demonstrating the inability of the nonmoving party to prove his case at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court cannot, however, resolve factual disputes by weighing conflicting evidence. *Brown v. Hughes,* 894 F.2d 1533 (11th Cir.1990), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990).

## FINDINGS OF FACT

### I. Stacy Mitchell

Stacy Mitchell has been employed by Carrier Corporation since October 1987. In 1991, he was employed as a Tester in Carrier's Test Department. Mitchell alleges that Defendant engaged in unlawful racial discrimination by permitting a racially hostile work environment to exist in its Athens, Georgia, plant. Mitchell cites several incidents in support of his hostile work environment claim.

Mitchell observed racial epithets written on the bathroom walls at the Carrier plant, such as "Woody Wilson—Nigger Ape," "Nigger," and "Niggers go home to Africa." Some of this racist graffiti remained on the bathroom walls for months, despite complaints to management by Plaintiff and others. Mitchell also noticed rebel flags and the initials "KKK" drawn on "travel packets," envelopes affixed to refrigeration units within the plant. He reported these incidents to his supervisor, Woodrow Wilson.

While at a team meeting on May 13, 1992, Mitchell heard Bryan Little repeat a racial epithet used by Willie Wilmot nine months earlier in reference to Mitchell and two other employees. According to Little, Wilmot made a statement to the effect that "there were 'niggers' on their shift who thought that they (black employees) were going to run the shift and that he wouldn't allow that." (Plaintiffs' Statement of Undisputed Facts, at

4). Upon discovering that Little repeated this racial epithet at a team meeting, Carrier advised Little that such conduct was unacceptable.

Carrier's Employee Handbook prohibited the "use of abusive or threatening language toward fellow employees...." Under the subheading "harassment," the Handbook reads that "[h]arassment in any form—verbal, physical, or visual—is against company policy ..." and briefly references "ethnic" remarks or animosity. Pursuant to the requests of Mitchell and others, Carrier announced that racially derogatory graffiti was unacceptable. Although Carrier did not detail the consequences of such misconduct, Carrier did fire one employee for using racial epithets.

On one occasion, Supervisor Don Pursley told Mitchell "that if I couldn't learn to get along with Ann [Chandler] that they would have to terminate me or I would have to find another place to work." Woodrow Wilson and Larry Tucker counseled Mitchell that the bickering between himself and Ann Chandler had to cease because it was disruptive to the workplace. Mitchell was also counseled by Larry Tucker after an employee told him that Mitchell referred to a coworker as a "redneck Klansman." Mitchell denied this allegation, and Tucker advised him that if he had made this statement, it was inappropriate. During this same meeting, Miller, a co-worker, asserted that Woodrow Wilson was biased and believed Plaintiff over him because Plaintiff was a black employee.

### II. Curtis Smith

Curtis Smith began working for Carrier in 1987 as a welder after being hired by Henry Wildonger, who was the supervisor of the welding department at that time. In 1991, when Carrier instituted the "team" concept, Smith became the "safety" point of the star for the "TIG" welding group. Smith contends that Carrier engaged in unlawful racial discrimination by permitting a racially hostile work environment to exist in its Athens, Georgia plant and by delaying training op-

portunities that would have promoted his rank and compensation as a welder.

Smith's co-workers resisted his efforts to ensure safety in the workplace. One white co-worker (Jennings) would ignore Smith's safety concerns and another (Lowe) would "give him a look" and "never speak to him ... acted different" after he asserted his safety responsibilities. A third co-worker, a Laotian (Veng Souysy), "wouldn't do nothing I asked him to do," had a negative attitude, and once flashed an arc in Smith's face and pushed Smith out of his work area. The relationship between Smith and Veng was amicable initially: "When I first started working with him, me and him got along well; but he was just the type, he didn't like to be told by no employee what to do."

Another dispute between Smith and a co-worker developed when Deborah Daniel, a black female, was injured when a 300–400 lb. metal frame fell on her. George Kelly reportedly was standing nearby but made no effort to offer any assistance. When questioned by the safety points, Kelly responded with profanity and stormed out of the office.[1] On the following morning, Kelly was called into a meeting of the safety points and employee relations. In response to the question of whether he would help his team members if they were injured, Kelly stated that he would assist "certain" people. Carrier did not reprimand Kelly for his misconduct.

On numerous occasions, Smith's co-workers made false allegations about his conduct and performance. Management always investigated these allegations, which led to Plaintiff being reprimanded on one occasion. Although Nightengale expressly acknowledged that Kelly was prejudiced, Nightengale did not discipline Kelly or report his behavior to the Plant Manager.

In 1992, Carrier began to integrate welding robots into the production process. Until Plaintiff's turn to train came, the opportunity to test and to train on the welding robots was determined in order of seniority, by shift. Plaintiff would have been the first black employee to train on the welding robot, but when his turn to train came, he was informed that informal training on the robot had been discontinued. Nevertheless, Smith saw Chuck Hardy, a white male, working on the robot with another welder.

Plaintiff and Chuck Hardy received formal training on the weld robot in October 1992, after which time both were permitted to operate the welding robots. Carrier explains that it stopped informal, on-the-job training because it was concerned that welders who had yet to attend formal training on robot programming might damage the expensive equipment.

### III. Tony Foote

Plaintiff Foote asserts that Defendant engaged in unlawful racial discrimination by refusing to hire him. Tony Foote applied for a position in Carrier's Paint Department on July 24, 1992. Plaintiff proceeded from his screening interview with Human Resources Manager Darrell Martin to an interview with the Paint Department shift supervisor and two Paint Department Team members. Tony Howard, a black male, was interviewed the same day as Foote. The interview team recommended Howard for the position; however, neither he nor Plaintiff was hired for the position. Howard learned from personnel that he was not chosen because he was "over qualified." Phillip Armentrout, a white male, was hired for the position.

Carrier attributes its decision not to hire Plaintiff to the interviewers' recommendation against hiring him due to his poor attendance record and lack of applicable skills. Plaintiff had missed three or four days of work that year and only had experience with residential painting. Carrier does not view such experience as qualifying an applicant because it uses an electrostatic, dry-powder application.

During 1992, Carrier hired five of twenty-seven black applicants (18.52%) and fourteen of seventy-four white or other applicants (18.92%) for positions in the Paint Department. Thus, five out of the nineteen individuals hired (26.32%) were black, a ratio that

---

**1.** The safety points questioned whether Kelly had helped remove the frame from Ms. Daniel, to which Kelly responded "What if I did; what if I didn't? Kiss my m_____ f_____ ass!" and left the office.

approximates the percentage of black applicants (27/111 or 24.32%).

## IV. Kenneth Stephens

Stephens worked at Carrier through ET-CON, a temporary services agency, from February 24 through early September 1992. On March 30, 1992, Stephens submitted his application for a position in the Paint Department and Darrell Martin, the plant Human Resources Manager, interviewed him. Martin discovered that Stephens had been fired from two previous positions. After consulting Doug Guenther, the Paint supervisor most familiar with Plaintiff's work, Martin also learned that Carrier team members had complained about Stephens' ability or interest in performing the "hanging" duties that a Painter had to perform. Consequently, Martin did not refer Stephens for a "team" interview.

Plaintiff maintains that a majority of the team recommended that he be hired as a permanent employee. Plaintiff's first supervisor, Tracy Kittle, told Plaintiff that his performance was "above standard." Plaintiff was not hired, however. Stacy Rowland and Calvin Bradberry, white males, were hired on April 1, 1992, and April 13, 1992, respectively.

Martin also did not recommend a white ETCON employee, Jeffrey Burrell, for further interviews because he had been fired from a previous job. Martin did, however, hire several other individuals despite their history of termination. Martin selected two white males, Lancer Nix and Jonathan Simmons, and a black male, Rufus Sims, despite their having been discharged from their most recent jobs.

Among the new hires in the Paint Department in 1992, only two of the twelve persons hired from outside applicants were black. In 1993, only one of the seven outside hires was black. Nevertheless, when all of the black applicants are considered, the representation of blacks among those hired in the Paint Department nearly matched their representation among applicants.

## CONCLUSIONS OF LAW

### I. Section 1985(3) and the Thirteenth Amendment

Plaintiffs' amended complaint cites 42 U.S.C. § 1985(3) and the Thirteenth Amendment as additional bases for their employment discrimination claims. Notwithstanding Defendant's motion for summary judgment, Plaintiffs have failed to offer any legal or factual support for these claims.

■ The Thirteenth Amendment does not create a cause of action for employment discrimination. *See Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1480 n. 12 (S.D.Fla.1987), *aff'd,* 865 F.2d 1272 (11th Cir.1988), *cert. denied,* 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). Therefore, Defendant is entitled to judgment as a matter of law with respect to this claim.

■ Plaintiffs fail to allege any facts in support of their Section 1985(3) claims. Section 1985(3), in relevant part, creates a cause of action for damages "[i]f two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...." Plaintiffs cannot demonstrate the "conspiracy" required to hold Carrier liable under § 1985(3) because a corporation cannot conspire with its own employees. *Baker,* 686 F.Supp. at 1479–80. Moreover, the law is well settled that the deprivation of a right created by Title VII does not support a claim under § 1985(3). *Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 377–78, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979). Thus, in the absence of any factual or legal support for Plaintiffs' § 1985(3) claims, Defendant is entitled to judgment as a matter of law.

### II. Retaliation under Section 1981

Mitchell contends that Carrier violated 42 U.S.C. § 1981 by retaliating against him for challenging Carrier's employment practices as discriminatory. Plaintiff consistently complained about the racist graffiti in the restrooms and the lack of promotional opportuni-

ties for blacks. As evidence of Defendant's retaliation, Plaintiff cites his repeated disagreements with Pursley, and the frequent counseling and investigations following false allegations by co-workers.

■ Although few courts have considered whether the Civil Rights Act of 1991 made retaliation claims cognizable under § 1981, in *Williams v. Carrier Corp.*, 889 F.Supp. 1528 (M.D.Ga.1995),[2] this court held that retaliatory discharge claims can be asserted under § 1981. Before a retaliation claim can arise, an individual must suffer an adverse employment action. The issue thus becomes whether the counseling and investigations cited by Plaintiff constitute adverse employment action. Given that Title VII jurisprudence provides the rubric for analyzing employment discrimination claims under § 1981, Title VII case law is an appropriate point of reference in analyzing Plaintiff's claim.

■ To establish a prima facie case of reprisal, plaintiff must prove that he: (1) "engaged in statutorily protected expression;" (2) "suffered an adverse employment action;" and (3) a causal link between the protected expression and the adverse action exists. *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir.1994) (citations omitted). The weak link in Plaintiff's claim is whether his complaints of racial discrimination resulted in any adverse employment action.

■ Plaintiff has not claimed that he suffered any tangible economic harm—no loss of salary, benefits, or position. Moreover, Defendant had legitimate reasons for counseling Plaintiff and conducting investigations of his behavior. The counseling Plaintiff received was an effort to alleviate the divisive, disruptive bickering of Plaintiff and Chandler. With regard to the false allegations made by Plaintiff's co-workers, Carrier had a responsibility to investigate each of them to determine their verity. Thus, because Plaintiff fails to produce sufficient evidence to demonstrate adverse employment consequences,

Defendant is entitled to summary judgment with respect to Mitchell's § 1981 retaliation claim.

### III. Title VII

■ The substantive employment discrimination law delineates the facts relevant to determining whether a party is entitled to summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Plaintiffs claim race discrimination under Title VII's hostile work environment and disparate treatment theories.

#### A. Mitchell

##### 1. Hostile Work Environment

■ Both Mitchell and Smith allege that Defendant engaged in unlawful racial discrimination by permitting a racially hostile work environment to exist in its Athens, Georgia plant. In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court interpreted the Title VII phrase "terms, conditions, or privileges of employment" as encompassing disparate treatment by an employer that creates a discriminatorily hostile or abusive working environment. To establish the existence of a hostile work environment, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), *quoting Meritor*, 477 U.S. at ——, 106 S.Ct. at 2405 (internal quotation marks omitted). *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995).

■ However, a plaintiff must show more than the "mere utterance of an ... epithet which engenders offensive feelings in an employee" to establish a violation of Title VII. *Id.* The plaintiff must show that in light of all the circumstances, the working environment was both subjectively and objec-

---

2. Defendant cited this order, which was subsequently published, as support for the proposition that retaliation claims are not cognizable under § 1981. (Defendant's Memorandum in Support

of Motion for Summary Judgment, at 25 n. 18). Obviously, this citation does Defendant no good in presenting its argument to the court.

tively abusive. Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 22–23, 114 S.Ct. at 371. A plaintiff may have an actionable claim even if the alleged racial remarks were not directed at him. *Edwards,* at 1522 (citing *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991)).

■■■ If the plaintiff succeeds in demonstrating racial harassment, there are two theories under which the employer may be held liable for the hostile work environment—vicarious and direct liability. If someone other than the plaintiff's employer, such as a co-worker, creates the hostile work environment, then the employer may be held liable under the doctrine of respondeat superior if the plaintiff can prove that "the employer knew or should have known of the harassment and failed to take remedial action." *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1512 (11th Cir.1989), *cert. denied,* —— U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995) (citing *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982)). Plaintiff can prove that the employer had knowledge of the harassment by demonstrating that he "complained to higher management or that the harassment was pervasive enough to charge the employer with constructive knowledge." *Id.* When the plaintiff's employer or an agent of the employer engages in the harassment, however, then the employer is directly liable for the harassment, regardless of whether the employer had knowledge. *Id.* (citing *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1558 (11th Cir.1987)).

To overcome summary judgment, Plaintiff must demonstrate the existence of a genuine issue of material fact regarding both his hostile work environment claim and Defendant's liability for the harassment. If Plaintiff fails to produce sufficient evidence on either of these issues, then Defendant is entitled to summary judgment.

■■■ In support of his hostile work environment claim, Mitchell details the written and verbal racial epithets he experienced at the Carrier plant.[3] Plaintiff has provided specific examples of the racially derogatory graffiti he saw on the walls of Carrier's restrooms. He has also noted one incident in which a co-worker repeated racially derogatory statements made about Mitchell by another co-worker. In addition, Plaintiff has characterized his conflicts with co-workers as the result of racial animus. Nevertheless, under the totality of the circumstances, Plaintiff has not demonstrated that such discriminatory conduct created a hostile work environment.

The discriminatory conduct described by Plaintiff is unquestionably humiliating. The racist graffiti in the restrooms, the "KKK" initials on the travel packets, and the repetition of a co-worker's racist statements would be offensive to the reasonable person. However, considering these incidents collectively, they simply are not "sufficiently severe or pervasive" to create a hostile work environment.

The severity of both the graffiti and the co-worker's statement is diminished by the circumstances of this case. With regard to the graffiti, those responsible for the graffiti were unknown and the epithets were written, rather than spoken. Likewise, although the racist statement repeated by Mitchell's co-worker may have been directed at Mitchell, the statement was only second-hand information.

The frequency of the graffiti is also unclear. Plaintiff has been employed by Carrier for approximately eight years. Although Plaintiff attests that he always observes racist graffiti in the restrooms, he has reported only a few specific instances.

Plaintiff has also failed to demonstrate that such conduct unreasonably interfered with his work performance. Plaintiff has only

---

3. The timing of Defendant's discriminatory conduct is irrelevant for purposes of determining whether Defendant is entitled to summary judgment, an issue of liability. The conduct that a jury considers in awarding damages under the Civil Rights Act of 1991 does not become an issue until after liability has been determined.

made general allegations about his diminished self-esteem and efficiency; he has failed to support these allegations with any specific examples of how this discriminatory conduct has had a deleterious effect on his performance. In fact, the evaluations of Plaintiff's work illustrate improved performance.

The Eleventh Circuit has held that racial slurs must be so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995), *citing EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990). The facts of this case are not egregious enough to create a hostile work environment.

■ Even if Plaintiff had produced sufficient evidence to establish a hostile work environment, he could not establish Carrier's liability. Defendant Carrier took steps to remove the graffiti and to counsel those with whom Plaintiff had conflicts, albeit not as quickly or in the manner Plaintiff might have preferred. Moreover, Carrier does have a written policy against any form of harassment and even fired one person for using racial epithets. Thus, Defendant is entitled to judgment as a matter of law with respect to Mitchell's hostile work environment claims.

## B. Smith

### 1. Hostile Work Environment

■ Smith contends that Defendant violated Title VII by creating a racially hostile work environment. The mere fact that many of Smith's subordinates were members of another minority group or white and refused to follow his safety instructions does not show that such misconduct stemmed from racial animus. Of course, Plaintiff may have inferred that racial animus motivated their misconduct, but none of his co-workers were overtly racist. The McDaniel incident represents another situation in which only an inference of discrimination can be made. One may infer racial animus from Kelly's statement that he would assist "certain" people, but this statement itself is not overtly discriminatory.

■ To survive summary judgment on a hostile work environment claim, Plaintiff must produce enough evidence that a reasonable jury could find that his workplace was "permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (citations omitted). Smith was not the target of racial epithets or any overtly discriminatory conduct. In fact, Smith's evidence of racial animus could just as easily be evidence of rebellion against his conscientious observance of safety measures. Smith's conflicts with his co-workers, without more, are not sufficient evidence of a hostile work environment. Therefore, Defendant is entitled to summary judgment with respect to Smith's hostile work environment claim.

### 2. Failure to Train

#### a. Exhaustion of Administrative Remedies

■ Plaintiff Smith claims that Defendant committed race discrimination when it removed him from welding robot training and replaced him with a white employee. Smith's EEOC complaint, however, does not specifically raise this claim. To comply with Title VII's administrative prerequisites, a claim omitted from the EEOC charge but subsequently raised in a lawsuit must be "like or related" to the claims raised in the charge. *Sanchez v. Standard Brands, Inc.*, 431 F.2d at 466 (quoted in *Eastland v. Tennessee Valley Authority*, 714 F.2d 1066, 1067 (11th Cir.1983)). If no such nexus exists, then the court lacks subject matter jurisdiction to hear the claim. *Buffington v. General Time Corp.*, 677 F.Supp. 1186, 1192 (M.D.Ga.1988).

■ Smith's EEOC complaint alleges that "Carrier has consistently shown a lack of promotion opportunities for black and other minority employees." (Smith's EEOC Charge, Exhibit 3). By referring to the lack of promotion *opportunities*, this claim implies more than just a statistical disparity in the number of minorities in more senior positions. Plaintiffs claim would likely lead to an

investigation of the means by which Carrier stifled opportunities for minority advancement. Because training on the weld robot precedes promotion to the position of Weld IV, Plaintiff's training claim is reasonably related to his promotion opportunities claim. Therefore, this court may properly consider the merits of Smith's training claim.

### b. Merits

■ Plaintiff effectively claims that the delay in his informal, on-the-job training constituted race discrimination affecting the conditions of his employment. Under the *McDonnell Douglas* rationale, a prima facie case of discrimination in the conditions of employment requires plaintiff to show that: (1) he belongs to a protected class; and (2) he was similarly situated to a person who was not a member of the protected class; but (3) did not receive a condition of employment provided to that person. *Thompkins v. Morris Brown College,* 752 F.2d 558, 562 n. 7 (11th Cir.1985). *See Potter v. Goodwill Indus.,* 518 F.2d 864, 865 (6th Cir.1975).

■ Plaintiff clearly satisfies the first two elements of the prima facie case. Plaintiff is African–American and held the same position as the white employee who was permitted to continue training on the robot as an assistant to another welder. However, Plaintiff's receipt of formal training on the robot in October 1992, only two months after his informal training was discontinued, raises the issue of whether he was actually denied a condition of employment. In fact, once Plaintiff and Hardy received formal training and demonstrated their skills, they were both allowed to operate the weld robots. The delay in training is nothing more than one of the "many interlocutory or mediate decisions having no immediate effect upon employment condition," which were not intended to fall within the parameters of Title VII. *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). Because Plaintiff was not denied a condition of employment, he has failed to establish a prima facie case of discrimination. Therefore, Defendant is entitled to summary judgment with respect to Plaintiff's training claim.

■ Even assuming that such training does constitute a condition of employment, Plaintiff has not produced sufficient evidence that he was treated differently from someone outside the protected class. Smith contends that his white co-worker, Hardy, continued to train on the robot because he saw a production card showing that Hardy was training on the robot two days after informal training had ceased. Moreover, Smith saw Hardy holding a "teach pendant" while working on the gantry with Lowe, a qualified welder. Smith must produce more than assumptions to overcome summary judgment. Both Hardy and Wildonger testified that Hardy assisted Lowe with the unskilled task of "loading," but was not allowed to "train." Thus, Plaintiff was not treated differently than similarly situated persons outside the protected class.

■ Finally, Defendant has articulated a legitimate, nondiscriminatory reason for this conduct. Defendant maintains that it had discontinued the informal training to prevent inexperienced welders from damaging the equipment. Given that Hardy was not permitted to train on the robot, Plaintiff has produced no evidence of pretext. Therefore, Defendant is entitled to summary judgment.

### C. Foote and Stephens

### 1. Pattern or Practice of Discrimination

■ Plaintiffs Foote and Stephens cite statistical disparities in Carrier's hiring as evidence of a "pattern or practice" of discrimination. *See Hazelwood School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). A prima facie case of a pattern or practice of discrimination may be established by gross statistical disparities alone. *Id.* 433 U.S. at 306–07, 97 S.Ct. at 2741.

### a. Stephens

■ Plaintiff Stephens sought a position in the Paint Department after he began working at Carrier through a temporary services agency. The statistics offered by Plaintiff Stephens compares the number of black persons hired from outside the Plant to the total number of outside hires. Among the new hires in the Paint Department in 1992,

**1580**

only two of the twelve (16.67%) persons hired from outside applicants were black. In 1993, only one of the seven (12.29%) outside hires was black. Plaintiffs statistics are inappropriate, however, because they take into account both race and the applicant's outsider status.

■■■ Defendant's statistics are more revealing because they isolate the race issue by measuring the percentage of all blacks applicants that were hired, taking into account both inside and outside applicants. *See Hazelwood*, 433 U.S. at 308–09, 97 S.Ct. at 2742 (affirming that the relevant statistical evidence was based on a comparison between the racial composition of those currently employed by the defendant and the racial composition of qualified applicants in the relevant labor market). During 1992, Carrier hired five of twenty-seven black applicants (18.52%) and fourteen of seventy-four white or other applicants (18.92%) for positions in the Paint Department. Thus, five of the nineteen individuals hired (26.32%) were black, a ratio that approximates the percentage of black applicants (27/111 or 24.32%). These statistics do not demonstrate that Defendant engaged in the systematic disparate treatment of blacks.

### b. Foote

Like Stephens, Foote sought a position in the Paint Department. Therefore, the same statistics are applicable to his claim that Defendant systematically discriminated against blacks. As previously discussed, these statistics fail to establish a prima facie case of race discrimination because the percentage of blacks hired approximated the percentage of black applicants.

### 2. Disparate Treatment

■■■ Alternatively, Plaintiffs seem to assert that even if discrimination was not Defendant's "standard operating procedure," they were discriminated against individually. Such claims of disparate treatment are governed by the *McDonnell Douglas* paradigm.

To overcome summary judgment, the plaintiff bears the onus of proving by a preponderance of the evidence that a prima facie case of discrimination exists. *Texas Dep't of*

*Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To demonstrate a prima facie case of discrimination for failure to hire, plaintiff must show: "(1) that he belongs to a protected class; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications, he was rejected; and (4) that after his rejection the position remained open and the employer continued to seek applicants of similar qualifications." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990). *See Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir.1995).

■■■ Plaintiff's establishment of a prima facie case of discrimination raises a rebuttable presumption that the employment decision was based on a criterion proscribed by Title VII. The employer may rebut this presumption by "articulating a legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If the employer produces sufficient evidence of a legitimate nondiscriminatory reason, then the burden of proof shifts back to the plaintiff to prove that the reason proposed by the employer is a mere pretext designed to disguise the proscribed discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Notwithstanding the shifting burdens of proof, at all times the plaintiff bears the "ultimate burden of persuading the [trier of fact] that he has been the victim of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–10, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

### a. Stephens

Stephens applied for a position in the Paint Department on March 30, 1992, while working at Carrier through ETCON, a temporary services agency. Neither Plaintiff nor Burrell, a white ETCON employee, were hired

because both had been fired from previous positions. Two white males were hired for the position in April 1992.

To overcome summary judgment, Stephens must establish a prima facie case of discrimination. The parties do not dispute the first two elements of the prima facie case. Defendant, however, contends that Stephens was not qualified for the position. Stephens had no painting experience other than that obtained while working in the Carrier Paint Department for ETCON. Moreover, Guenther, Stephens' supervisor, had reported complaints about Stephens work. Plaintiff had also been fired for two previous positions.

■■■■ The fact that Martin rejected Burrell, a similarly situated white applicant, for the same reasons as Stephens undermines any claim of discrimination. Both of the applicants hired were more qualified than Plaintiff. Stacy Rowland, a white ETCON employee, had more experience in Carrier's Paint Department than Stephens and had been recommended by Tracy Kittle, the day shift Paint supervisor. Likewise, Calvin Bradberry had significant experience as a production supervisor. Plaintiff fails to establish a prima facie case of discrimination because he has not shown that he was qualified for the position. Therefore, Defendant is entitled to summary judgment on Stephens' claims of race discrimination.

### b. Foote

Likewise, Plaintiff Foote fails to produce sufficient evidence to raise an inference of race discrimination. In July 1992, Foote applied for a position in the Paint Department but was not hired. Phillip Armentrout, a white outside applicant, was selected for the position.

■■■■ To establish a prima facie case of discrimination, Plaintiff must show that Carrier refused to hire him notwithstanding his qualifications and thereafter continued to seek someone with similar qualifications. Plaintiff has not demonstrated that he was qualified for the position or that the person hired had similar qualifications. Carrier did not consider Plaintiff's residential painting experience as qualifying him for the electrostatic, dry-powder application it uses. Moreover, Armentrout, the white applicant hired for the position, had ten years of experience as a self-employed paint contractor and had also worked in the Carrier Paint Department through ETCON, a temporary services agency. Thus, Plaintiff was not similarly situated to the person hired for the position.

■■■■ Plaintiff also relies on the rejection of Howard as "over qualified" to raise an inference of race discrimination. However, this scintilla of evidence is not sufficient to raise an inference of race discrimination, especially in light of the fact that three black Carrier employees without prior paint experience applied and were hired in the Paint Department in August 1992. Thus, Plaintiff has failed to produce sufficient evidence for a reasonable jury to find that race discrimination motivated Carrier's decision not to hire him. Therefore, Defendant is entitled to judgment as a matter of law with respect to Foote's claims.

### SUMMARY

Reading the facts in the light most favorable to Plaintiff, the court concludes that Plaintiffs Mitchell, Smith, Stephens, and Foote have failed to produce sufficient evidence for a reasonable jury to be able to find in their favor. Plaintiffs Mitchell and Smith have not demonstrated that they suffered from a racially hostile work environment or that Defendant failed to take adequate remedial steps. Likewise, Plaintiffs Foote and Stephens have not demonstrated that Carrier's decision not to hire them in the Paint Department was motivated by racial animus. Accordingly, for the foregoing reasons, Defendant's Motion for Summary Judgment is hereby **GRANTED.**